UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KATIE KINDL,

       Plaintiff,                                    Civil Action No. 12-CV-13410

vs.                                                     HON. BERNARD A. FRIEDMAN

CITY OF BERKLEY, et al.,

       Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

This matter is presently before the Court on plaintiff's motion for partial summary judgment [docket entry 28] and defendants' motion for summary judgment [docket entry 29]. Response and reply briefs have been filed as to each motion. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide these motions without a hearing.

Plaintiff Katie Kindl has brought this action as the personal representative for the estate of her mother, Lisa Kindl, who died on July 13, 2010, of alcohol withdrawal while in the custody of the City of Berkley police department. The essence of the complaint is that the defendant police officers knew or should have known that the decedent was suffering from alcohol withdrawal but failed to provide her with medical care, and that the city failed to train its officers to recognize alcohol withdrawal in detainees and to respond appropriately. Plaintiff asserts (1) a Fourteenth Amendment claim against the individual defendants for being deliberately indifferent to decedent's serious medical needs, and (2) state-law claims against the individuals for negligence, infliction of emotional distress, wrongful death, and violation of the Michigan Constitution. She also asserts (1) Fourteenth Amendment claims against the City of Berkley and its department of public safety and

police department[1] for failing to train and supervise its officers and for failing to implement policies and procedures regarding the appropriate handling of detainees with alcohol withdrawal, and (2) the above-mentioned state-law claims against these defendants under respondeat superior.

Except where indicated below, the facts of this case are largely undisputed. On July 12, 2012, decedent was arrested when she reported to her Berkley probation officer and tested positive (0.05) for having consumed alcohol, in violation of the terms of her probation. A state district judge ordered that decedent be held in custody until a hearing the next day. The lawfulness of her arrest and detention are not in question. Defendant Dzendzel arrested decedent at 9:30 a.m. and took her to the lock-up at the Berkley police department. The desk officer, defendant Geary, asked decedent as part of the booking process if she had any of the medical problems (including alcohol withdrawal) listed on the department's Medical and Insurance Fact Sheet. *See* Defs.' Ex. B (Pg ID 379). Decedent told Geary she had none of these medical problems. Geary Dep. at 11. Before the booking process was finished, while she was signing the property sheet, decedent told Geary "that she may be going through alcohol withdrawal later . . . ." *Id.* at 12, 14, 29. Geary passed on this information to Dzendzel. *Id.* at 12-13. Geary placed decedent in a cell, gave her food at 4:20 p.m., and believed she "appeared to be in good health" through the end of his shift at 7:00 p.m. *Id.* at 14. At shift change, Geary informed the next desk officer about decedent's statement regarding possible alcohol withdrawal. *Id.* Geary does not recall decedent seeking his attention,

_____

[1] In their motion for summary judgment, defendants correctly note that the public safety and police departments have no capacity to be sued because they are not entities separate from the city. *See, e.g., Haverstick Enters., Inc. v. Fin. Fed. Credit, Inc.*, 32 F.3d 989, 992 n.1 (6th Cir. 1994); *Moomey v. City of Holland*, 490 F. Supp. 188, 189 (W.D. Mich. 1980). Plaintiff offers no argument to the contrary. The Court shall therefore grant summary judgment for the Berkley Police Department and the Berkley Department of Public Safety.

and he watched her throughout his shift both on a video monitor and by looking through the cell window. *Id.* at 15, 30. Geary "never noticed anything physically wrong with her. She never appeared to have any signs of any type of illness. She never indicated to me at all that she was feeling ill after the initial statement where she said she may be going through something later." *Id.* at 17.

When Geary told Dzendzel about decedent's statement regarding possible alcohol withdrawal, Dzendzel told Geary to "keep an eye on her." Dzendzel Dep. at 26. Dzendzel's only other contact with decedent occurred from 4:10 p.m. to 5:00 p.m. when he relieved the dispatcher. [2] *Id.* at 47. He monitored decedent and saw nothing unusual about her. *Id.* at 48. Dzendzel's shift ended at 7:00 p.m. *Id.* at 26.

At 7:00 p.m., defendant Herriman came on duty as the desk officer and defendant Moschelli came on duty as the dispatcher. Herriman Dep. at 11, 20. At approximately 8:00 p.m. decedent stood up and pounded on the cell window. [3] According to Herriman,

> She stated that she had urinated on herself. She stated that she thought she may go through DTs at some point during the night. I asked Dispatcher Moschelli to ask her what she needed and if she needed medical attention. She declined medical attention. Stated that she only wanted us to keep an eye on her and that was the end of our communication.

*Id.* at 20. Herriman "wanted to clarify that at that time she did not need medical attention, which

---

[2] The dispatcher and desk officer sit next to each other in an area across the hall from the lock-up. *See* Defs.' Ex. E (photos of lock-up).

[3] In their written statements, Moschelli and Herriman both indicated this occurred at 11:00 or 11:30 p.m. *See* Defs.' Ex. F (Pg ID 429) and Ex. G (Pg ID 473). However, plaintiff's and defense counsel agree that this actually occurred, according to the videotape, at approximately 8:00 p.m. *See* Defs.' Summ. J. Br. at 3; Pl.'s Resp. Br. at 2.

she did clarify." *Id.* at 21.  Thereafter, Herriman watched decedent frequently on the monitor and

also by looking through the cell window and he "didn't observe anything abnormal that would cause

me concern." *Id.* at 35-36, 74, 80.  Moschelli testified that this was decedent's first and only attempt

at communication.  Moschelli Dep. at 24.  After speaking with decedent, who used a "normal tone,"

Moschelli "watched for any problems" and turned on the intercom to decedent's cell so that he and

the desk officer could hear anything occurring in that cell.  *Id.* at 28, 53.  Moschelli testified that

decedent did not attempt to communicate with the officers again, and Moschelli saw no signs she

was in distress.  *Id.* at 32, 61, 63-65, 70.

An inmate in the adjacent cell gives a different account of this evening's events.

Michael McClanahan testified as follows:

> A. [E]very time I looked over there, just about, she was walking
> around looking up or making a motion.
> Q. At the camera?
> A. Yeah.
> Q. Did it appear to you that she was trying to get attention or
> assistance?
> A. Yes.
> Q. Did anyone ever come to help her?
> A. No.
> Q. And over what period of time did this happen when she was trying
> to get somebody to help her?
> A. . . . I want to say somewhere between 8 and 11, I guess. . . .
> Q. But the period of time, was it a two-hour period of time? An hour –
> A. Yeah, something like that.
> Q. So during the two-hour period of time, she had been trying to get
> attention by waving at the camera?
> A. Well, yeah. She said a few things. I could hear her making noises
> like moans and stuff.
> Q. She was moaning? You have to speak verbal.
> A. Yeah. It sounded to me like she was moaning. I know she was
> sick. You could tell that by looking at her.
> Q. How could you tell?
> A. She had this shock. I don't know. Almost a clammy look. . . . She
> was just no expression.

4

\*   \*   \*

A. But I know she was trying to get somebody to look, somebody's attention. She really tried to get somebody's attention.

Q. By doing what?

A. Waving at the camera and hollering. Not holler hollering, but she just – right there at the end, I couldn't hardly hear her. It just sounded like she said help me. And I think shortly after that she probably just went over there and laid down. . . .

\*   \*   \*

Q. During that period of time, you didn't hear anybody respond to her or come to her cell or anything?

A. No. . . .

\*   \*   \*

Q. From your testimony, she was trying to get help for approximately two hours and no one came to her assistance; it that correct?

A. Seemed to me. Or longer.

\*   \*   \*

Q. Did you feel, from your observing her, that she was in distress?

A. She was in distress, but I didn't know, you know, that she would be deceased the next day.

\*   \*   \*

Q. When she would look up at the camera and talk, what would she say?

A. Hello, hey, need some help, help. Best I could hear. Best I could remember.

McClanahan Dep. at 8-11, 50-51.  He testified he heard decedent moan once for a few seconds and then, "[a] little bit later," again for a few seconds. *Id.* 32-33.  McClanahan also indicated he once saw decedent "bending over a little bit, holding her mid section."  *Id.* 33.

Another detainee at the Berkley lock-up, Andre Henry, testified that he

A. . . . just heard some – some female. She kept on screaming,

5

yelling.

Q. Okay.

A. First time she just said help me, and then after that she kept on saying I need to see somebody. I need to see somebody.

\*   \*   \*

Q. All right. And how long did you hear this person calling?

A. It was about 15, 20 minutes, because I was – that's about the time they took to book me in, take by fingerprints and stuff.

Q. Did anyone to your knowledge go back and assist her or help her?

A. Not to my knowledge, no. I didn't see anyone.

\*   \*   \*

Q. Okay. So she was calling for about 15 minutes you said?

A. About 15, yeah.

Q. And what was the tone of her voice?

A. I mean, it – it sounded like she was in distress, like she needed some help.

Q. Okay.

A. Like she was in pain.

Q. Okay. And –

A. Because she started crying.

Q. She was crying?

A. Yes.

Q. Okay. Did any of the officers make any comments about her?

A. They just said she was a bug.

Henry Dep. at 7-9.

From 1:30 to 3:00 a.m. defendant Miller relieved Herriman as desk officer. During this time, Miller looked into decedent's cell and she appeared to be sleeping. Miller Dep. at 39. Miller noticed nothing unusual. *Id.* At 2:30 or 3:00 a.m. defendant Arney relieved Miller as desk officer. He looked at decedent through the cell window and she appeared to be sleeping on the bench. Arney Dep. at 33.

In his written statement, Herriman indicates that he and Arney both checked on decedent at 2:45 and 4:30 a.m. *See* Defs.' Ex. G (Pg ID 473). At 2:45 a.m. decedent "showed

6

movement consistent with breathing and appeared normal." *Id.* At 4:30 a.m. decedent "ha[d] a flushed face consistent with a heavy drinker which appeared to coincide with Kindl's statement about alcohol withdrawal. At the time I did not observe any signs of trouble with Kindl." *Id.* When Herriman and Arney checked on decedent at 6:05 a.m., her face and arm were purple and she was unresponsive. Decedent was taken by ambulance to the hospital where she was pronounced dead at 6:25 a.m. *See* Defs.' Ex. H. The county medical examiner, who performed an autopsy, determined the cause of death to be "alcohol and benzodiazepine withdrawal and complications." *Id.* The time of death is unknown. *Id.*

The only other officers who had contact with decedent were defendant Gabriel, who brought her food at approximately 9:15 p.m. and noticed nothing unusual about her appearance or behavior; and defendant Penn, who worked as the dispatcher until 7 p.m. on the day decedent was placed in the cell and saw her frequently in the monitor, and she noticed nothing unusual in her appearance or behavior. *See* Gabriel Dep. at 10, 37; Penn Dep. at 20, 30, 32. A video recording of decedent's cell showed decedent's left arm and left leg shaking for approximately 40 seconds from 11:53 to 11:54 p.m. *See* Pl.'s Resp. Br. Ex. D (Pg ID 1326). One of plaintiff's experts, Dr. Werner Spitz, M.D., testified that the evidence is consistent with decedent dying at that time. Spitz Dep. at 32.

### *Motions for Summary Judgment*

Defendants seek summary judgment on all of plaintiff's claims. Plaintiff seeks summary judgment on her failure-to-train claim. Under Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[T]he mere existence of *some* alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* dispute as to any *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Viewing the evidence in the light most favorable to the opposing party, summary judgment may be granted only if the evidence is so one-sided that a reasonable fact-finder could not find for the opposing party. *See Anderson,* 477 U.S. at 248-50; *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478-80 (6th Cir. 1989). In other words, "[a] material issue of fact exists where a reasonable jury, viewing the evidence in the light most favorable to the non-moving party, could return a verdict for that party." *Vollrath v. Georgia-Pacific Corp.*, 899 F.2d 533, 534 (6th Cir. 1990). "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

Before addressing the parties' arguments regarding the specific claims, the Court notes that plaintiff appears to have abandoned her case as to several of the individual defendants. The complaint names 15 individual defendants. On October 23, 2012, plaintiff stipulated to the dismissal of the complaint as to four of them (Laity, Onesko, Tanghe and Pinkos). In their motion for summary judgment, defendants argue that none of the remaining 11 individuals are liable. In her response brief, plaintiff argues that the case should proceed as to five of them (Dzendzel, Geary, Eshman, Herriman and Moschelli), but she makes no mention of the other six (Hadfield, Arney, Miller, Robinson, Penn and Gabriel), presumably because these six had little or no interaction with decedent.[4] Because plaintiff does not oppose the motion as to these six, and has made no effort to

---

[4] As noted above, Miller's and Arney's only involvement was that they looked into the cell and saw, they believed, decedent sleeping during the early morning hours of July 13. Gabriel brought decedent food the preceding evening at approximately 9:15 p.m. and noticed

demonstrate the existence of any genuine issues of material fact as to them, the Court shall grant summary judgment for these defendants on this basis. Accordingly, the Court shall analyze the parties' arguments only as to defendants Dzendzel, Geary, Eshman, Herriman, Moschelli and the City of Berkley.

### A. *The Federal Claims*

Plaintiff's federal claim as to the individual defendants is that they were deliberately indifferent to decedent's serious medical needs, in violation of the Fourteenth Amendment. The legal standards governing a case such as this were recently summarized by the Sixth Circuit as follows:

> It has long been established that, under the Eighth Amendment's prohibition against cruel and unusual punishment, prisoners have a constitutional right to medical care. *Estelle v. Gamble*, 429 U.S. 97, 103–04, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). This determination of a "sufficiently serious medical need is predicated upon the inmate demonstrating that he or she is incarcerated under conditions imposing a substantial risk of serious harm." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 812 (6th Cir. 2005) (internal quotation marks omitted). Additionally, "'[t]he due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 539 (6th Cir. 2008) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983)); *see also Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005).
>
> While this right to medical care does not impose an affirmative duty on the government to screen detainees for all possible ailments, this court has "long held that prison officials who have been alerted to a prisoner's **serious medical** needs are under an obligation to offer medical care to such a prisoner." *Comstock*, 273

---

nothing unusual. Penn was the dispatcher during the day shift on July 12 and noticed nothing unusual. Hadfield and Robinson, according to an internal investigation conducted by Sgt. Crum into this incident, apparently had no contact with decedent until after she had died. *See* Pl.'s Ex. D (Pg ID 1325).

F.3d at 702 (emphasis added). "If a prisoner asks for and needs medical care, it must be supplied." *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989). Failure to provide medical treatment when circumstances clearly evince a need amounts to a deprivation of constitutional due process. *Dominguez*, 555 F.3d at 552.

"For the failure to provide medical treatment to constitute a constitutional violation, [the plaintiff] must show that the defendants acted with 'deliberate indifference to serious medical needs.'" *Id.* at 550 (quoting *Estelle*, 429 U.S. at 104, 97 S.Ct. 285). The test for deliberate indifference to a medical need is both objective and subjective. "The objective component requires a showing that the alleged deprivation is sufficiently serious—that [the detainee] was incarcerated under conditions posing a substantial risk of serious harm." *Garretson v. City of Madison Heights*, 407 F.3d 789, 796–97 (6th Cir. 2005) (internal quotation marks omitted). Furthermore, the risk must be "one which society deems so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Talal v. White*, 403 F.3d 423, 426 (6th Cir. 2005) (internal quotation marks omitted). To satisfy the subjective component, the plaintiff must demonstrate that the defendant possessed "a sufficiently culpable state of mind in denying medical care." *Estate of Carter*, 408 F.3d at 311 (internal quotation marks omitted). This is the equivalent of showing that the "authorities knew of, and manifested deliberate indifference to, [the detainee's] serious medical needs." *Talal*, 403 F.3d at 426.

* * *

The subjective component requires that the facts alleged by the plaintiff, if true, show that the official "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock*, 273 F.3d at 703 (citing *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970). At the same time, while officials may not deliberately disregard a medical need, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106, 97 S.Ct. 285. Specifically, "if the officers failed to act in the face of an obvious risk of which they should have known but did not, then they did not violate the Fourteenth Amendment." *Garretson*, 407 F.3d at 797. Inadvertent failure or negligence in providing medical care does not rise to the level of a constitutional deprivation, as deliberate indifference "describes a state of mind more blameworthy than negligence." *Farmer*, 511 U.S. at 835, 114 S.Ct. 1970.

10

> Nevertheless, a plaintiff is not required to show that the
> official acted "for the very purpose of causing harm or with
> knowledge that harm will result." *Ibid*. Liability can be imposed "if
> he knows that inmates face a substantial risk of serious harm and
> disregards that risk by failing to take reasonable measures to abate
> it." *Id*. at 847, 114 S.Ct. 1970 (emphasis added).

*Stefan v. Olson*, 497 F. App'x 568, 576-78 (6th Cir. 2012). "The liability of each individual

defendant must be analyzed separately." *Smith v. County of Lenawee*, 505 F. App'x 526, 530 (6th

Cir. 2012).

In the present case, the Court shall assume that decedent had a serious medical need

while she was in defendants' custody. The autopsy report confirms that she died of alcohol

withdrawal less than 24 hours after being arrested. One of plaintiff's experts, Dr. Werner Spitz,

M.D., testified that decedent died of DT (delirium tremens), a stage of alcohol withdrawal. *See* Pl.'s

Ex. C. Defendant Eshman, the director of public safety for the City of Berkley, testified that alcohol

withdrawal is a potentially serious medical condition that can require hospitalization and even result

in death. Eshman Dep. at 49-51, 65. The National Institutes of Health described delirium tremens

as "a severe form of alcohol withdrawal that involves sudden and severe mental or nervous system

changes" which "is serious and may be life threatening." Pl.'s Ex. A. The Sixth Circuit has

"recognized that delirium tremens constitutes a serious medical need, as have other circuits." *Bertl*

*v. City of Westland*, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009). Therefore, the objective

component of this claim is established.

Evidence supporting the subjective component of the claim, however, is entirely

lacking as to defendants Dzendzel, Geary and Eshman.[5] As noted above, Dzendzel's only contact

---

[5] The complaint names Eshman both individually, *see* Comp. ¶¶ 14, and in his capacity as
the Berkley public safety director responsible for training Berkley's police officers. *See id.* ¶ 61.

with decedent was that he arrested her, brought her to the police station for processing, and saw her briefly later in the afternoon as she sat in the lock-up. His only knowledge of decedent's condition was that her blood alcohol content was 0.05 and that during the booking process she told Geary "that she may be going through alcohol withdrawal later." In response to this latter piece of information, Dzendzel told Geary to "keep an eye on her." Dzendzel saw decedent later that afternoon when he relieved the dispatcher between 4:10 and 5:00 p.m. and he noticed nothing unusual about her.

Geary's knowledge of decedent's condition was no different from Dzendzel's. He asked decedent if she had any of the medical conditions listed on the intake sheet and her only response was that she "may be going through alcohol withdrawal later." Geary monitored her throughout his shift, which ended at 7:00 p.m., and he noticed nothing unusual about her. Geary gave her a meal at 4:20 p.m. and he believed she appeared to be in good health. Decedent never indicated she felt ill and Geary did not notice her trying to get his attention. When his shift ended, Geary says he passed on to the next desk officer (Herriman) decedent's comment about possibly experiencing alcohol withdrawal later.[6]

Eshman had no contact with decedent at all until after she had died. The first time he ever heard of her was when defendant Hadfield called him at home and told him "there was a death in the station in the cell." Eshman Dep. at 73. Plaintiff offers no evidence showing that Eshman was personally involved in this incident.

---

In this section of this opinion, the Court addresses only Eshman's individual liability.

[6] Geary testified that at the end of his shift at 7:00 p.m. he told the next desk officer about decedent's statement. *See* Geary Dep. at 14. However, the next desk officer, Herriman, testified that at the start of his shift at 7:00 p.m. he was not aware of decedent's potential alcohol withdrawal. *See* Herriman Dep. at 13.

Under these circumstances, plaintiff's Fourteenth Amendment claim fails as to Dzendzel, Geary and Eshman because plaintiff has produced no evidence from which a jury could find that they were aware decedent had a serious medical need and that they took no appropriate steps to address it. Eshman had no contact with her and knew nothing about her. Decedent's statement that she "may be going through alcohol withdrawal later" was insufficient to place Dzendzel or Geary on notice that she actually was experiencing or likely would experience alcohol withdrawal, and nothing more than monitoring decedent was called for under the circumstances. *See, e.g., Meier v. County of Presque Isle,* 376 F. App'x 524, 530 (6th Cir. 2010) (affirming summary judgment for sheriff's deputy who placed an intoxicated arrestee, who later had a seizure, in a holding cell where he did not appear to need medical care because "he cooperated, communicated effectively, and walked unassisted").

Plaintiff argues that Dzendzel and Geary should have referred decedent for a medical evaluation based simply on her statement that she "may be going through alcohol withdrawal later," and that by failing to take this step they were deliberately indifferent. *See* Pl.'s Resp. Br. at 21-22. This argument fails because the subjective component of a deliberate indifference claim turns not on whether defendants could have taken additional steps to ensure decedent's safety but on whether they "subjectively perceived facts from which to infer substantial risk to the prisoner, that [they] did in fact draw the inference, and that [they] then disregarded that risk." *Comstock*, *supra.* The facts of which these defendants were aware (i.e., decedent's statement that she *may* experience alcohol *later* and their direct observation throughout the daytime shift that she showed no signs of illness or distress) did not suggest "substantial risk" to decedent's health or safety. Nor did they draw any such inference. Dzendzel testified that in his 25-years of experience at the Berkley public safety

13

department he never encountered a prisoner who required medical attention due to alcohol withdrawal and that he saw nothing unusual about decedent.  Dzendzel Dep. at 48-50.  Geary testified to the same effect, although he has less seniority with the Berkley public safety department than Dzendzel.  Geary Dep. at 14, 29-30.  As noted in *Speers v. County of Berrien*, 196 F. App'x 390, 395 (6th Cir. 2006), "[w]hile delirium tremens is a serious medical condition, which generally requires immediate hospitalization, the same is not true of general alcohol withdrawal, which typically may be managed in a prison setting and indeed frequently is managed there."

Because no jury could find that defendants Dzendzel, Geary or Eshman (in his individual capacity) were deliberately indifferent to decedent's serious medical needs, the Court shall grant summary judgment in their favor on the Fourteenth Amendment claim.

A different picture emerges as to defendants Herriman and Moschelli.  Viewing the evidence in the light most favorable to plaintiff, by crediting the testimony of the other inmates[7] and discounting that of defendants themselves, a jury could find that Herriman and Moschelli were aware at the beginning of their 7:00 p.m. shift that decedent had stated she might be experiencing alcohol withdrawal (*see* n.5, *supra*); that decedent informed them shortly thereafter that she may soon be experiencing delirium tremens; that for a period of perhaps two hours she showed signs of

---

[7] Defendants urge the Court to disregard Henry's testimony because "[t]here is no dispute that Ms. Kindl died before midnight on July 12th. . . . He arrived at Berkley at 3:29 a.m., and was in the booking room about 72 seconds before being placed in the cell at 3:30 a.m., hours after Ms. Kindl had died."  Defs.' Reply Br. at 1.  So far as the Court is aware, the time of death has not been established.  As noted above, the autopsy report indicates the time of death could not be determined, and Dr. Spitz testified only that the seizure decedent experienced shortly before midnight was consistent with her dying at that time.  The only undisputed facts regarding the time of death are that Herriman and Arney found decedent to be unresponsive at 6:05 a.m. and that she was pronounced dead 20 minutes later.  Whether Henry heard decedent will be for the jury to decide.

14

distress (urinating on herself, moaning, crying, screaming, yelling, waving at the camera, pleading for help and exhibiting a shocked expression and sick appearance); and that defendants nonetheless took no action. All of the defendants in this matter, including Herriman and Moschelli, testified that it was the policy of the Berkley public safety department to summon medical help whenever the need was apparent or whenever an inmate requested it. But if the testimony of the other inmates, McClanahan and Henry is believed, then it is apparent that Herriman and Moschelli disregarded this policy by ignoring both plaintiff's requests for medical help and the obvious signs that such help was needed. The obviousness of the need for medical assistance, combined with defendants' violation of the city policy requiring that such assistance be provided, is sufficient evidence of deliberate indifference to defeat defendants' motion for summary judgment as to these two defendants. *See Bertl*, 2009 WL 247907, at *5 ("We can find subjective knowledge based on the obviousness of the risk."); *Jackson v. Wilkins*, 2013 WL 827725, at *6 (6th Cir. Mar. 6, 2013) (citing authority for the proposition that a defendant's "failure to follow 'stated jail policy'" can be evidence of deliberate indifference). Accordingly, the Court shall deny defendants' motion for summary judgment as to defendants Herriman and Moschelli on plaintiff's Fourteenth Amendment claim.[8]

Plaintiff also directs her Fourteenth Amendment claim at the city and its public safety director, defendant Eshman, on the theory that they "fail[ed] to properly train and supervise the Individual Defendants and to develop and implement policies and procedures for prisoners with medical needs . . . ." Compl. ¶ 32. Elsewhere plaintiff articulates this claim in terms of the

_____

[8] Defendants Herriman and Moschelli are not entitled to qualified immunity because the right of inmates and pretrial detainees to receive care for their serious medical needs was clearly established long before the incident at issue in the present case. *See Stefan*, 497 F. App'x at 579. Whether defendants violated that right is a question the jury must answer by resolving the factual dispute regarding decedent's behavior and appearance during the shift that began at 7:00 p.m.

municipal defendants

> failing to provide medical treatment; creating or allowing the continuance of the custom under which the alcohol/drug withdrawal protocol was not followed and inmates were not appropriately treated for alcohol withdrawal; being grossly negligent in supervising subordinates who failed to monitor and provide medical treatment; and/or exhibiting deliberate indifference to Plaintiff's Decedent's rights by not acting on information which indicated that unconstitutional acts were occurring, . . . .

*Id.* ¶ 43. In essence the claim is that the city and the public safety director failed to train their officers to recognize and respond to alcohol withdrawal and delirium tremens.

The seminal "failure to train" case is *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), in which the Supreme Court held that

> the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact. This rule is most consistent with our admonition in *Monell*, 436 U.S., at 694, 98 S.Ct., at 2037, and *Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981), that a municipality can be liable under § 1983 only where its policies are the "moving force [behind] the constitutional violation." Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice BRENNAN's opinion in *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484, 106 S.Ct. 1292, 1300-1301, 89 L.Ed.2d 452 (1986) (plurality) put it: "[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *See also Oklahoma City v. Tuttle*, 471 U.S., at 823, 105 S.Ct., at 2436 (opinion of REHNQUIST, J.). Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality-a "policy" as defined by our prior cases-can a city be liable for such a failure under § 1983.

*Id.* at 388-89 (footnote omitted). As Justice O'Connor explained in her concurring opinion,

> In my view, it could be shown that the need for training was

16

obvious in one of two ways. First, a municipality could fail to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face. As the majority notes, *see ante*, at 1205, n.10, the constitutional limitations established by this Court on the use of deadly force by police officers present one such situation. The constitutional duty of the individual officer is clear, and it is equally clear that failure to inform city personnel of that duty will create an extremely high risk that constitutional violations will ensue.

* * *

Second, I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion. In such cases, the need for training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements.

*Id.* at 396-97.  In the interim the Sixth Circuit has held that in a failure-to-train case "[t]o establish deliberate indifference, the plaintiff 'must show prior instances of unconstitutional conduct demonstrating that the [municipality] has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury.'" *Miller v. Sanilac County*, 606 F.3d 240, 255 (6th Cir. 2010), *quoting Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005).  *Accord Fox v. Van Oosterum*, 176 F.3d 342, 348 (6th Cir. 1999) (plaintiff must show more than "an isolated, one-time event" to establish a failure-to-train policy or custom).  Plaintiff must show "(1) a clear and persistent pattern of mishandled medical emergencies for . . . detainees; (2) notice, or constructive notice of such pattern, to [the city]; (3) tacit approval of the deliberate indifference and failure to act amounting to an official policy of inaction; and (4) that the custom or policy of inaction was the 'moving force,' or direct causal link, behind the constitutional injury." *Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005).

17

In the present case, the Fourteenth Amendment claim against the city and the public safety director fails because plaintiff has produced no evidence of prior instances of a Berkley lockup detainee being denied medical care. Not only is there no evidence of such a pattern; there is no evidence of *any* such cases *ever* occurring involving any medical condition, alcohol withdrawal or otherwise. Defendant Eshman, who has been the Berkley public safety director since 2002, testified that he has "never heard of lack of medical care being alleged" and that to his knowledge the City of Berkley has never been sued based on such an allegation. Eshman Dep. at 10, 67-68. Plaintiff has offered no evidence to the contrary.

Nor is this a case where the municipality had a "total lack of any . . . policies, practices, and adequate training for this type of constitutional claim." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2005). Defendants testified, and plaintiff does not deny, that the City of Berkley provides a great deal of medical training to all of its public safety officers. Eshman testified that he "require[s] my officers to be medical first responders, they're trained for that, they have to keep updated." Eshman Dep. at 26. "A medical first responder is one step below the basic emergency medical technician. . . . [I]t's a certification." *Id.* at 27. Eshman also requires that "two officers go to every ambulance run in the city . . . to be able to learn from the [ambulance] people and recognize these signs of trauma so we're constantly doing training." *Id.* at 54. In addition, in April 2007 Eshman adopted General Order No. 15, which requires "the officer in charge to see that medical attention is provided for prisoners when necessary" and a visual check of every detainee "at least every fifteen (15) minutes." Defs.' Ex. N; Eshman Dep. at 30. The individual defendants testified uniformly that under this policy they were required to call for medical assistance whenever a detainee requested it or whenever the need for such assistance was apparent. *See, e.g.,* Geary Dep.

18

at 29-30; Dzendzel Dep. at 9, 20;  Herriman Dep. at 22; Arney Dep. at 35-36; Hadfield Dep. at 53;

Robinson Dep. at 74; Eshman Dep. at  42-43, 45.  Further, emergency medical care is immediately

available: "The ambulance company that we utilize . . . has an office perhaps 200 yards from our

police station and they would stage their rig in the parking lot . . . adjacent to the station."  Eshman

Dep. at 39.

       Defendants acknowledge the City of Berkley does not train its officers specifically

in recognizing and responding to alcohol withdrawal.  While plaintiff faults the city and the public

safety director for this failure, she has not shown that specific training of this nature was

constitutionally required.  Plaintiff has produced no evidence to demonstrate that detainees suffering

from alcohol withdrawal are encountered at the Berkley lockup so frequently that this is a "recurrent

situation[] that a particular employee is certain to face," thereby resulting in "an extremely high risk

that constitutional violations will ensue."  *Harris*, *supra*.[9]  Nor has she shown that detainees

suffering from alcohol withdrawal, but who show no visible symptoms of distress, necessarily

require immediate medical care.  That is, plaintiff has not shown the constitutional inadequacy of

a policy requiring jailers, who are trained as medical first responders, to provide medical care to all

---

[9] Defendants, on the other hand, testified that they had rarely, if ever, encountered a detainee who needed medical care due to alcohol withdrawal.  Dzendzel, a 25-year veteran of the Berkley public safety department, could not recall a single time when a detainee with alcohol problems required medical attention.  Dzendzel Dep. at 48-49.  Gabriel, whose length of service is not mentioned in the submitted deposition pages, could not "recall having a prisoner who you had to get medical attention for because they were in alcohol withdrawal."  Garbriel Dep. at 39.  Eshman, a police officer since 1969, indicated that he has "seen people that needed to be hospitalized because of their alcohol withdrawal" but that he was unaware of any cases where alcohol withdrawal or delirium tremens resulted in death.  Eshman Dep. at 10, 51.  As, as noted above, the Sixth Circuit has indicated that "general alcohol withdrawal . . . typically may be managed in a prison setting and indeed frequently is managed there."  *Speers,* 196 F. App'x at 395.

detainees who request it and to those who exhibit visible symptoms. Eshman testified he learned, through experience and training, that "alcohol withdrawal or drug withdrawal could become symptomatic through a number of visually-recognizable symptoms . . . . [I]t's when it becomes symptomatic that it became a threat and that's how it was handled." Eshman Dep. at 49-50. Eshman listed shakiness, sweating, vomiting, stomach pain, breathing difficulties and hallucinations as being among these symptoms. *Id.* at 52. The Court notes that plaintiff's expert, Dr. Werner Spitz, M.D., listed similar symptoms and incontinence. Spitz Dep. at 21.[10] Plaintiff has offered no evidence suggesting that a jailer cannot adequately address a detainee's alcohol withdrawal and delirium tremens by monitoring for "any signs of trauma, illness," Eshman Dep. at 58, and summoning medical assistance at that time.

In short, plaintiff has not shown that the city or its public safety director was deliberately indifferent to detainees' safety. These defendants train their officers as "medical first responders" and have a written policy requiring them to provide medical care to any detainee who requests it or who shows signs of illness or distress. If, as plaintiff contends, defendants Herriman and Moschelli disregarded decedent's pleas for help and her symptoms of distress, they did so contrary to their training and the city's policy. In this event, the city's policy or custom cannot have been the "the moving force of the constitutional violation." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Nor has plaintiff produced evidence that the municipal defendants "ignored a history of abuse" and that they were "clearly on notice" that specific training was needed regarding alcohol withdrawal and delirium tremens in order to avoid endangering detainees in situations such

---

[10] Another of plaintiff's experts, Dr. Joe Goldenson, M.D., testified that "urination isn't a symptom of withdrawal . . . ." Goldenson Dep. at 104.

as those presented in this case. The Court shall therefore grant summary judgment for the City of Berkley and public safety director Eshman on plaintiff's Fourteenth Amendment claim and deny plaintiff's cross motion for partial summary judgment.

**B. *The State-Law Claims***

Plaintiff's complaint also asserts the following state-law claims: gross negligence (Count III), negligent and intentional infliction of emotional distress (Counts V and VI), "negligent hiring/training/retention of employment services/lack of protocol" (Count VII)[11], wrongful death (Count VIII), violation of the Michigan Constitution (Count X), and negligence (Count XI). In their motion for summary judgment, defendants argue that all of these claims fail for various reasons, including that the City of Berkley and defendant Eshman are statutorily immune from tort liability; that the individual defendants were not grossly negligent and their immunity is therefore not overcome; the individual defendants acted in good faith and therefore they cannot be held liable for intentional torts; the claim for intentional infliction of emotional distress fails on the merits because defendants' conduct was not extreme and outrageous; and no cause of action for damages exists directly under the Michigan Constitution.

In her response to defendants' summary judgment motion, plaintiff ignores most of these arguments and defends only the state-law claims against the individual defendants for intentional infliction of emotional distress. The Court shall grant summary judgment for defendants on all of the other state-law claims, as plaintiff has abandoned them. Additionally, for the reasons stated below the Court shall grant summary judgment for all of the individual defendants except

---

[11] This appears to be both a state-law claim (based on "negligence") and a federal claim (based on "violations of 42 U.S.C. § 1983 and constitutional rights"). *See* Compl. ¶¶ 60-61. To the extent this is a federal claim, it has been dealt with above.

21

Herriman and Moschelli on the intentional infliction claim.

Under the Michigan governmental immunity statute, defendants are immune from liability for an intentional tort if (1) they were acting within the scope of their authority, (2) "the acts were undertaken in good faith, or were not undertaken with malice," and (3) the acts in question were discretionary as opposed to ministerial. *See Oliver v. Smith*, 290 Mich. App. 678, 684 (2010).[12] In the present case, the only remaining state-law claim is for intentional infliction of emotional distress, and the disputed issue as to this claim is whether defendants acted in good faith. In this context, "good faith" has been defined as follows:

> *Ross* did not elaborate on this element, relying instead on Prosser on Torts and the cases cited therein. Prosser noted that the "considerable majority of the state courts take the position that there is no immunity where the inferior officer does not act honestly and in good faith, but maliciously, or for an improper purpose." "[O]fficial immunity should not become a cloak for malicious, corrupt, and otherwise outrageous conduct on the part of those guilty of intentional abuse of power...." The cases cited by Prosser indicate that there is no immunity when the governmental employee acts maliciously or with a wanton or reckless disregard of the rights of another.

*Burland v. French,* 2012 WL 2362442, at *4 (Mich. App. June 21, 2012), *citing Ross v. Consumers Power Co.*, 420 Mich. 567 (1984). Other cases have framed the test as whether the officer "has utilized wanton or malicious conduct or demonstrated a reckless indifference to the common dictates

---

[12] The issue of "gross negligence" comes into play only when plaintiff asserts a negligence claim against government employees. *See Oliver*, 290 Mich. App. at 684 (noting the distinction between intentional torts and negligence in the governmental immunity analysis; "[i]f the plaintiff pleaded a negligent tort, proceed under MCL 691.1407(2) and determine if [among other things] the individual's conduct amounted to gross negligence that was the proximate cause of the injury or damage"). Similarly, the issue of whether defendants' negligence was "the proximate cause of the injury or damage" arises only if plaintiff alleges negligence. Since plaintiff has abandoned her negligence claims, the Court need not address defendants' arguments regarding gross negligence and "the" proximate cause.

22

of humanity." *Dickey v. Fluhart*, 146 Mich. App. 268, 276 (1985), *citing Firestone v. Rice*, 71 Mich. 377, 384-87 (1888). Other courts have stated that "willful and wanton misconduct is made out only if the conduct alleged shows an intent to harm or, if not that, such indifference to whether harm will result as to be the equivalent of a willingness that it does." *Gentry v. Wayne County Deputy Sheriff Carmona*, 2011 WL 4810847, at *6 (Mich. App. Oct. 11, 2011), *quoting Burnett v. City of Adrian*, 414 Mich. 448, 455 (1982). "The . . . purpose underlying this factor is to 'protect[ ] a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.'" *Gentry*, 2011 WL 4810847, at *6, *quoting Odom v. Wayne County*, 482 Mich. 459, 481-82 (2008).

In the present case there is no evidence that any of the defendants other than Herriman and Moschelli acted maliciously, outrageously, or with wanton or reckless disregard for decedent's health and safety. The analysis provided above, explaining why the Court is granting summary judgment for Dzendzel, Geary and Eshman but not for Herriman and Moschelli as to plaintiff's Fourteenth Amendment claim, applies equally to her tort claim. There simply is no evidence of malice as regards Dzendzel, Geary and Eshman. However, if the jury finds that Herriman and Moschelli ignored plaintiff's pleas for help under the circumstances as described by inmates McClanahan and Henry, then the jury could also find that these defendants did not act in good faith (and are therefore not entitled to immunity) and that the elements of intentional infliction of emotional distress[13] are met.

---

[13] "The tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. Liability for such a claim has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."

23

*Conclusion*

       For the reasons stated above,

       IT IS ORDERED that defendants' motion for summary judgment is granted as to all defendants except Herriman and Moschelli and as to all claims except plaintiff's claim under the Fourteenth Amendment and her state-law claim for intentional infliction of emotional distress.

       IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment is denied.

               S/ Bernard A. Friedman_____
               BERNARD A. FRIEDMAN
               SENIOR UNITED STATES DISTRICT JUDGE

Dated: August 21, 2013
       Detroit, Michigan

---

*Haverbush v. Powelson*, 217 Mich. App. 228, 233-34 (1996) (citations omitted).